It is case number 21-16437 Getzen v. Long and we should have one counsel by video there he is and one in person. Sir, can you hear me? Yes, Your Honor, I can. Can you hear me? Yes, we can hear you and see you so that's great. You must be Mr. Chandran, is that right? That's correct. Great. All right, welcome to the Ninth Circuit. Thank you very much. If virtually. Counsel, you are Mr. Jellison? I am, Your Honor. Great. Welcome to the Ninth Circuit. To you too. We're ready to hear argument when you're ready. I'm ready. Thank you, Your Honor. Good morning. May it please the court. My name is Jim Jellison. I represent former Yavapai County Sheriff's Deputy Jeff Long. I'd like to reserve two minutes. I always say that and it never works out quite that way. Good luck. In this matter, we're asking the court to reverse the district court's denial of qualified immunity as to Deputy Long in regards to his use of force under the particular facts of the case because the amount of force that he used was constitutionally reasonable and it did not violate clearly established law that existed at the time of the incident in August of 2016. Can I tell you what my questions are so that I can maybe stay out of your way because we see lots of these cases and the difficulty for me as I've looked to see the precise cases that Judge Bolton relied upon and as you know there's always different circumstances. So what I'm curious about is whether there how much time there was before the tasing or the pepper spraying. How much can we tell from the record whether whether there was an interval where he was given an opportunity to comply with their commands? I think the interval is and in terms of time, I don't think the record reflects a stopwatch related time but what the record does reflect is that originally Deputy Long tried to knock on the door and get an answer and get access and have communication. When that was denied, the owner of the apartment, Ms. Comfey, you know, used her keys and locked the door and Deputy Long was able to enter. Deputy Hurl showed up and was a six foot one, 250 pound intoxicated person and you can read all the other facts that are attendant to it. And we have read them and I understand that they, you know, I'm sure we all did. We take these cases really seriously. So he went through the house, lots of time calling him, telling him to come out. It seems like a lot of opportunity for him to comply and he didn't. He later says he was afraid, be that as it may, he's found on the bathroom floor, right? And as domestic violence incidents go, that's another tricky fact here because we take those also very seriously. It can be really serious and dangerous for officers. But in this indication, there wasn't a report of a weapon. So I'm mindful of that. She didn't report he had been violent to her. It was a verbal dispute and then, you know, took the batteries out of the cell phone. So what the district court found is that as DV incidents go, this wasn't particularly serious. Is that contested? I contest that and I'll explain why. And I do want to answer the other question though, that even though we don't have a stopwatch time, we know that these deputies did a lot of things that in the, in what are referred to as the clearly established law cases, law enforcement didn't do. Okay, but I'm talking about telescoping it down to where they see him in the bathroom. Was there any warning or delay, you know, between the use of the tasing and the pepper spray once they confront him and he can see them, then we don't have anything, right? The record shows repeated commands from Deputy Hurrell to show your hands and to stand up. And they're, they're referred to as repeated. So there's enough time for that to happen. What case says that simply not complying with repeated commands justifies using a taser and pepper spray repeatedly? Well, you have to look at the totality of the circumstances. I think that it's the Ava case is the case that comes closest to the facts of, of this particular case. Um, I think the Casella case also comes very close to this. Casella is even, even less compelling than this case. In that case, um, uh, Hughes was carrying a knife. She wasn't committing a crime. She was near her roommate, but her roommate wasn't afraid. The police were on the other side of the fence. They told her to drop the knife. She didn't drop the knife and they employed deadly force. Everything's different when there's a weapon and we don't have a weapon here or even incident or a threat of, to the officers or do we? I think that we do. And Casella doesn't strike me as a good case for you. Um, given, given the weapon, but what is the weapon? Based on the description of the facts, it seems like you think his person, just that he's a big person. Well, show me a case where you need a weapon in order, in order to deploy a taser. My understanding of the law is when you have an intermediate use of force that that's, you, you can't use an person. I think our case law says that. I think my understanding is that you concede this is intermediate use of force. We've said that tasers and pepper spraying, at least tasers in the dart mode and pepper spraying are intermediate use of force. So I think the dispute is, is he passively resisting or is he doing something more than that? Is that fair? Okay. I don't think that's fair because, and I love to read the Brian case because it's a great battle royale between and the majority, but whether you call it intermediate or not, the question is the situation and the tools you're taking away from the police to use less than lethal force. And like any other case that we have here, we had somebody who disabled a phone precisely so that the law enforcement wouldn't be involved in a domestic violence situation. They evaded police by going into somebody else's house and they continue that invasion, evasion by hiding in a dark bathroom. Now I'm not, I haven't been a police officer. Part of that calculus is they also, he also just let her leave the apartment without incident. There was no allegation or incident of any sort of physical force against her. She was allowed to leave. She wasn't constrained from leaving. She went across the street, she got help. So that's part of the calculus too. What would you like the police to do, your honor? Just say, hey, he'll leave when he leaves. You go hang out. That's why I asked the question. If we have a circumstance where someone is dead weight, think about, I don't know, a sit-in at the Dean's office. You know, someone's just not complying the ultimate in passive resistance, which we don't have here. I don't, but this is just a hypothetical. Has our law addressed how long they have to wait if police officers have to just pick people up? Have we gotten there? The threat is, and officers, this is very on that point, after the first tasing, is there anything, the record, whether his hands were visible or not? There was nothing to suggest that. In fact, the record is that he continued to not comply. I guess, but at least one officer said he apparently took out one of the, you know, the tase darts. So, I mean, there's presumably, presumably you can see his hands. Conceivable, briefly, one hand would have been exposed. That's my concern is, you know, I understand your argument that maybe didn't see his hands initially, but after he got tased, I know the officer said it was not effective, but if he could then see that he doesn't have any weapons, you know, why can't they then, they're two officers, and maybe they could get more backup and, you know, handcuff him and lift him and remove him. I cite that case. The glint of steel is not what you need to see in order to employ some level of force, and the fact that somebody's got their hands that are not visible, that are behind them, and they're refusing commands to show them, that's a serious threat to officers. Now, what would you have the officer do if not using a taser or pepper spray? Would you have them use their firearm and engage in deadly force? Would you have them go hands-on? Counsel, of course not, but is there, that Judge Bolton made a finding that she didn't see any indication, so show me if she's wrong, if you would, any indication that they considered less serious force, and what she questioned was, you know, picking him up and handcuffing him. Is she wrong about that? I think she's wrong about that. Four years ago, we had a deputy that went hands, or a DPS trooper that went hands-on in a routine traffic stop. His handgun was taken from him, just got out of the military, his last day of FTO, and he was shot and killed. So going hands-on is not a safe option, and that's why I say be careful about taking away tools that are less than lethal, that allow an officer to engage. If you could stop pointing your finger at us, I'd appreciate it. I'm sorry. That's okay, I know you don't mean anything, but it's not helpful, it's not particularly respectful, so go ahead. All right, and I didn't mean that, but the point is, you now have two tools, pepper spray and less than lethal options, that still create distance between the two, that are both less than lethal, and guess what? This situation ended without the officer being seriously injured, with there only being a minor injury to the plaintiff, and nobody died. Right. Also, I mean, here's the struggle. Go ahead. I mean, none of us would dispute that but it seems like your argument leads to the place of, anytime somebody does not comply with an order and I can't see their hands, we can tase them. I think you have to look at the totality of the circumstance, and that's what's required. You know, in the Emmons case, this court said, we can't just rely on general law anymore. Quote, sufficiently similar factual circumstances have to be part of the case to have placed the constitutional question beyond debate. If you analyze every case that was cited by the district court and by the appellee in this case, and I looked at every single fact of every single case, these cases are so different, you could drive a truck through them. Most of them are out in the open for extended encounters. This is the only case where there's closed in, dark, in a bathroom encounter. Dark, closed in, dark, or dark. And closed in and in a bathroom with a non-compliant, large, intoxicated, evading suspect. And there is no law that I see that prevents a taser use or a pepper spray use. And it's incumbent upon the court, the Supreme Court tells us that to find the law. I like the Emmons trilogy. The Emmons trilogy is expressive. They denied qualified immunity. The Supreme Court said, you've got to find a fact pattern that fits this. It went back to the Ninth Circuit, back to this court, and the court could not find a case. They got some ones that were close, but not close enough. There's not one close enough here. I have a question over time. I'm over time. So I want to get my question and give you an opportunity to respond if I could. Has, is there any indication in the record that the officers gave warning before using pepper spray or tasing? Yes. You want to talk about that? Yes. As Deputy Long entered the house, and I believe this was on the first floor, he said, you need to come out. And if you don't, you might be tased and you might be pepper sprayed. And that is in the record. What about when they came face to, I've read that. What about when they came face to face with them? I don't believe that that warning was repeated in the bathroom. Okay. And have we ever said that it needs to be? A warning is given when feasible, but here a warning. A warning. I know we've said we have to give a warning before using deadly force when feasible. Have we ever said, made an incomparable ruling about intermediate force, sir? I don't think that there's an absolute ruling, but there was a warning here. And I know there's no case that says that once you have given a warning and the record said it was a loud warning, that you have to continually repeat that warning. Okay. I've taken you over time. Are there more questions before we hear from opposing counsel? Okay. For planning purposes, we'll put another minute on. You're about almost two minutes over. When you come back, we'll put a minute on the clock so you can count on that. I appreciate that. Not at all. Thank you. We'll hear from opposing counsel, please. Good morning, Your Honors. Can you hear me okay? We can hear you. Great. So my name is Ashok Chandran with the Legal Defense Fund here on behalf of plaintiff David Getzen. And if it's all right, I'd like to start by taking us back to what the record in this case actually establishes when it's construed in the light most favorable to Mr. Getzen. It must be given the procedural posture. You bet. Can I just ask you, we can hear you volume-wise. There's a funny kind of echo. So it's fine on our end, but if you speak a little slower, it'll be easier for us to get every word. Okay. I'll try to slow myself down. I apologize for that. That's all right. So the record in this case establishes that Deputy Long and his partner, Deputy Hurl, encountered Mr. Getzen while he was seated on the bathroom floor with his back against the wall and his hands behind his neck. They were responding, as you honestly noted- His hands behind his neck? His neck. Yes. That's correct, Your Honor. And they were responding to an agency assist call stemming from what Deputy Long himself described as a verbal argument that had ended over an hour prior and involved no allegations of physical violence by Mr. Getzen. And in fact, Deputy Long had been specifically told that Mr. Getzen was unarmed. Deputy Hurl then issued two commands to Mr. Getzen, telling him both to lie on his stomach and to stand down. And when Mr. Getzen did nothing in response, by the deputy's own admissions, remained seated, stationary, and silent, Deputy Long tased Mr. Getzen in the chest, pepper-sprayed him in the face, and tased him in the back of the leg. At that point, Deputy Long's own words are that Mr. Getzen calmly, excuse me, calmly asked Deputy Long to stop tasing him. And in response, Deputy Long pepper-sprayed Mr. Getzen in the face one more time. As a result of that use of force, Mr. Getzen spent three hours in the ER, for 16 hours had issues breathing, and developed heart problems after that. The District Court properly denied Deputy Long's motion for summary judgment and denied Deputy Long qualified immunity on that read of the facts, finding that if a jury finds those facts, Deputy Long violated the right unequivocally stated by this court in Gravelet-London v. Shelton in 2013, that is, the right to be free from the application of non-trivial force for engaging in mere passive resistance. That principle and that right has been repeatedly reaffirmed by this court, even after the Supreme Court's decision in City of Escondido v. Emmons. In fact, in that case, the Supreme Court specifically instructed the circuit on remand to apply the Gravelet-London rule, criticizing the panel there for defining the right as simply the right to be free from excessive force. As recently as last year, in the case of Rice v. Morehouse, this court reaffirmed that Gravelet-London remains good law in the circuit and is sufficiently specific to defeat qualified immunity. And this court has in countless opinions since Gravelet-London and since Emmons, used that Gravelet-London principle to deny qualified immunity to officers. Counsel, if I may interrupt, can you address the question I asked your opposing counsel? Is there anything in the record of whether his hands were visible after the initial tasing? Thank you for asking that, Your Honor. I do want to address that because the record is actually a little confusing on this point. Neither of the deputies actually say they observed Mr. Getson remove the prongs. Both of them say simply that it looked as though he might have. So there's no actual affirmative observation. The only affirmative statements come from Appellant's and I think as Your Honor noted. Why do I have that in my notes that he pulled them out? Did I, was that in the court's findings? Did I, might be my notes are just wrong, but you think that that's not supported by the record? The record says both deputies state that it looked as though he pulled the prongs out and the court, I think, parroted that language in the district court's opinion. Okay. So. Thank you. Sorry, Your Honor, I didn't mean to cut you off. No, you didn't. You didn't. Thank you. But if you could, I've interrupted your answer to judge these questions. Sure. So, so first I don't believe the record necessarily supports that Mr. Getson actually did remove the prongs himself. But as Your Honor noted, even if he had, I think the deputies are trying to have it both ways here by saying both that they never saw his hands throughout the encounter and that he used his hands to remove the prongs. Both of those things can't really be true. And I think given the deputy's repeated insistence that he never moved his hands, Deputy Hurl unequivocally says on page ER 47 of the record that Mr. Getson consistently kept his to suggest that he actually affirmatively took the prongs out. Does it matter? Why does it matter about, or is it because it just because you could see his hands? Is that? I think under either read, whether he took the prong out or not, the use of forces here, the uses of force here wouldn't be constitutionally permissible. But it seems to me, and you know this, we sometimes see when people are under the influence that they can withstand kind of a remarkable amount of tasing, it seems, on occasion. And it seems to me that if the officer's using intermediate force and the guy's just ripping the tasers out unfazed, that would suggest that he's more of a danger. So to me, it mattered. In terms of the sequence, you know, I think of this as four applications of force. And I have real concerns about whether a warning was given or whether a warning should have been given, you know, whether we've really ever required a warning, how much time, what opportunity was there for this person to comply? And all of that seems pretty fuzzy to me, to be frank. But it's the last use of force that I have the most trouble with. And I wonder if that alone doesn't sustain the district court's finding here that a reasonable jury could find force was excessive. Because at that point, three applications had been used, as you know. And then I think it's uncontested that this person calmly said, please stop tasing me. And then he pepper sprayed. And that's the one that strikes me as the most problematic. I want to give you both a chance to respond to that one, because that's what's bothering me. Of course. So if this court does choose to parse out the individual applications of force, then I think we would agree that the last use of pepper spray is the most constitutionally problematic, that we believe that all four applications of force were not constitutionally justified. And just on the note we don't need to do that, right? I think that's correct, Your Honor. But I do want to just address a couple of points with respect to the warnings and the amount of time that passed here. First, on warnings, it's true that this court has never required a warning for intermediate force to be used. But it has noted that the relevance of whether warnings were given and whether warnings were possible in Nelson v. City of Davis, which is a case that involved the use of pepper spray. And this court specifically noted that the failure to give warnings before using pepper spray counseled in favor of finding a Fourth Amendment violation. What about the warnings that were given? And the officers testified that they came in the house hollering and gave warnings. So, Your Honor, the officers state that they issued the warnings that they might use for us from outside the apartment calling into the first floor. The record doesn't indicate how loud those commands were given. The record doesn't indicate how many times those warnings were given. There's only that one indication that they said it from outside. And it's, I think, undisputed as counsel acknowledged that by the time they got into the house, while they're clearing the first floor, while they're clearing the second floor, they don't issue any further warnings. Well, they did say come out. And I think that the plaintiff responded they didn't come out because he was afraid of that. I'm assuming he's afraid because he knows they're coming in, he can hear them. Is that an unfair inference? Your Honor, I think that that might be a fair inference. But I also don't know if it's particularly relevant to assessing the used force here. But I also... I don't mean to... Why not? What they know, quote unquote, know is that he's not complying with their command to come out, right? That's correct, Your Honor. But again, I think in light of the fact that, in light of Mr. Getson's intoxication, there's a real question here as to whether Mr. Getson could even comply, was lucid enough to comply with commands. And the fact that this entire encounter takes place over the course of just minutes. The record shows that Deputy Hurl arrived to the scene at 8.10pm. Deputy Long and Deputy Hurl have a conversation where Deputy Long briefs Deputy Hurl on what this camp relayed, what the situation is. And then by 8.15, Mr. Getson is under arrest and other officers have been called to the scene. So the entire thing happens in a really short period of time. And there's no indication that Mr. Getson was actually given a meaningful opportunity to comply, whether officers actually took time to assess the situation. Deputy Long just jumped straight to the use of the taser. And I think that that's important because the only thing that Mr. Getson is alleged to have done during the course of the entire encounter with the officers is sit quietly and refuse to comply with commands, which under this court's precedence of Forrester v. City of San Diego and Nelson v. City of Davis is the definition of passive resistance. There's no allegation that Mr. Getson said anything, yelled anything at the officers, moved around suddenly, moved his hands at all. And I think that is important because the cases that Deputy Long relies on an appeal here, Isayeva and Kisela, I think are so vastly different because they involved situations where individuals who are under arrest took affirmative steps to endanger officers or endanger third parties. In Isayeva, the officers were attempting to arrest a domestic violence subject, a domestic violence, potential domestic violence perpetrator. And in doing so, the man made a sudden move to grab something. The officers tried to put hands on him. And then the arrest, he began swinging the officers around and officers described as being thrown from wall to wall. And this court found that the use of a taser in that situation was reasonable. Similarly, in Kisela, officers arrived to find a woman with a knife who had previously been using the knife to try to hack at a tree advancing towards someone without any clear indication of whether she would use it. Officers had to make the split-second judgment there of whether the woman was credibly threatening the person she was advancing towards. Here, the only person who would have been involved in that verbal argument, Ms. Kemp, had left the apartment over an hour prior. Mr. Getson was seated and did nothing throughout this entire encounter. So there was not the same justification that existed in Kisela and Isayeva for Deputy Long to use force here. You're just about out of your time. If there aren't any questions, I'd like you to wrap up, please. That's all I have. So we'd submit that the district court's decision was correct and should be affirmed because the Grab with London Rule squarely governed what Deputy Long did here. Thank you. Thank you, Your Honors. All right, I will talk fast. The district court actually did a pretty good job of reciting the facts on ER 3 through 5. But the district court also made a finding that it was undisputed that, and this appears, by the way, at ER 12. If I could find the quote. Take your time. Your Honor, I don't have much time. No, you can answer our questions. Don't worry. It was undisputed that Mr. Getson did not exit the residence, did not follow commands, and did not show his hands. That's what the district court found after looking at all the facts. So I want to make sure I'm really clear on what your argument is. Your argument is that this was not mere passive resistance, right? No, it's an evasion. It's a flight. It's in a DV situation. It's with an intent to avoid law enforcement. Although there was no reported weapons, Ms. Confey was unsure whether he would resort to violence and putting hands behind your despite commands is a dangerous situation for officers, period. I find it interesting that they cite Gravelette Blondin for the highly general proposition that you can't use a taser for passive resistance when that case was the taser of a bystander who wasn't even involved in the arrest, who didn't do anything wrong, in the open, didn't commit a crime, just didn't move back far enough. That case has no resemblance. Can you address the last use of force with pepper spray? I mean, that's where I'm struggling where you have justification. The first one, maybe you can say he can't see his hands, but then they pepper spray him again and presumably if you've got pepper spray in the face, your hands would probably try to cover your eyes. They'd tase him again. Then after that, they pepper spray him again the last time. And when they were taking him away, apparently he had defecated on himself and had to pull him out, which suggests that two tasers had already done the job. So I don't see how you can justify that last use of force. And I know in the Hyde case, that was your concern, the last uses of force after there was a restraint of a very violent jail detainee. That was a chokehold, so it's certainly different. Trying to find a case on all forces is always challenging, right? But after the three uses of intermediate force, and then he says, apparently calmly, please stop tasing me, and they pepper spray him. That's the one that's got me. So could you speak to that? Yeah, and I think that's a great question because you have to look at all these uses of forces, uses of force separately. But there's a taser, a drive stun taser to the back of the leg. And at that point, he quote unquote calmly says, please stop tasing me. But the record doesn't suggest that at that point, he's complying with commands or showing his hands. And so the pepper spray, and as you look at the record, it's the combination of that last taser and the pepper spray that allows Deputy Long to place handcuffs on him. I'm not sure they knew whether he had defecated himself at that point in time. I'm not sure that's in the record. But you can see that combination of the taser and the pepper spray evokes the compliance and the handcuffing that, except for getting him out of the bathroom, ends the need to use a taser and ends the need to use pepper spray, which distinguishes this case from this Court's decision in January in the Hyde matter. Thank you. Are there more questions? I'm going to circle back to this because I still don't understand your position. How do you distinguish between active and passive resistance? I'm not sure that's been completely defined. But I love the question because typically in your passive resistance scenarios, you're going to deal with somebody who goes dead weight or somebody who just moves their hands in a way that you can't handcuff them. And police officers will tell you that kind of passive resistance. I've seen it. People that just go limp or they move around. They're not really doing anything threatening and they're not really doing anything that can cause harm. But in this case, we have an evasion and a failure to show hands. And even Mr. Getson says, I was actively evading the officers. I had a bad past experience. They don't know this, but even he admits it. But I think when you're given a command to show your hands after you've evaded, you are now actively resisting a detention. You are not simply being passive. You are now presenting as a threat to avoid your detention. It's one of the reasons that matters to me. And we've been really looking at this record to try to figure out the interval because, of course, the first use of taser, I think, is in dart mode. And so, you know, we're always concerned that people are given an opportunity to comply. So I can't. That's why I'm trying to figure out how rapid the use of force, you know, what the sequence was, because I think his failure to comply. When we talk about passive resistance or active resistance, I think the officer's best argument is that he's not complying. And I'm trying to figure out if he had an opportunity to do so. Yeah. And Your Honor, I think all the prior warnings showed him that opportunity. But I don't want this Court to miss clearly established law. I could sit here for two hours and talk to you about the 10 cases. Well, we're not going to let you do that. But here's the deal. If you could just get to, because you're now like five minutes over. But, you know, I mean, Matos talked about this. So we've got this, and we certainly see this as a former trial court judge. We've heard a lot of testimony about the extent to which tasers interfere. That's the idea, interfere with the central nervous system. And so, and we know that this individual wound up defecating himself. So there was, you know, some question about whether the first taser affected him or not, because there's some indication they pulled the prongs out. But at some point, the tasers were certainly having an effect. And so that's, do you want to speak to that at all? About how long they have to wait? Is there any indication that they did wait or give them opportunity to comply? I think if you give repeated commands to show your hands and you're not showing your hands, you don't have to wait for a gun to be the next thing that gets pulled out. I don't think there's anything. And you don't think that, is there, have we ever said anything about after tasing, giving an opportunity to comply, the officers have to wait and give an opportunity to comply? Have we ever talked about that? Not to my knowledge. Okay. But again, the deputy yelled loudly on the first floor that if you don't come out, you're going to get tased and pepper sprayed. And Mr. Getson didn't say anything. He didn't come to the door. He didn't say I live here. He didn't say anything until the drive stunt tasing. And then even then, he's not complying. He's just saying, hey, don't tase me again. I have to cut you off or someone's going to come with a hook for me, if not for you. So we'll have to hold it up there. But we appreciate your arguments, both of you very, very much. And we'll take this important case under advisement. Have a good day. Thank you. To all you all.
judges: CHRISTEN, LEE, FORREST